**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PETER SUNG OHR, REGIONAL DIRECTOR OF, REGION 13 OF THE NATIONAL LABOR RELATIONS BOARD, FOR AND ON BEHALF OF THE NATIONAL LABOR RELATIONS BOARD,** | ) | |
| **Petitioner,** | ) | **No. 17 C 2656** |
| **v.** | ) | |
| **MTIL, INC.,** | ) | **Magistrate Judge Cole** |
| **Respondent.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**A.**

Peter Sung Ohr, Regional Director of Region 13 of the National Labor Relations Board ("Petitioner") seeks a preliminary injunction pursuant to Section 10(j) of the National Labor Relations Act ordering MTIL, Inc.: a) to bargain in "good faith" with United Electrical, Radio and Machine Workers of America, Local 1103 over the terms of employment of its production and maintenance workers, b) to restore the status quo by reinstating a discharged employee, who was the Union's lead organizer, and c) to allow MTIL's employees to exercise their rights guaranteed by the Act. The defendant vehemently disagrees with the Petitioner's assessment of the case. The Petitioner has an administrative case about all this running on a parallel track to this one.

In February of 2017, the Petitioner lodged a complaint of unfair labor practices against MTIL before the National Labor Relations Board. A hearing was held before an Administrative Law Judge on May 8-11, 2017, and the parties had until June 15, 2017 to file briefs. They are now awaiting the ALJ's decision. In the meantime, a month before the administrative hearing, the Petitioner filed this

action. The Petitioner's brief in support of its petition for preliminary injunction seeks to portray the case in rather grim and absolute terms, almost as though a provocative presentation can resolve the case against MTIL, Inc. Thus, we are told, among other things, that the present case presents no less than an employer's "crusade" against its employees and its commission of "egregious" violations of the NLRA that "cannot be eradicated by the mere passage of time or the Board's usual remedies." [Dkt. #20 at 1-4, 10-11]. Of course, "saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). While "[a] siren turns more heads than a birdsong does," Charles Kuralt, American Moments, 11 (1998), claims of catastrophe are often needlessly exaggerated, and sometimes they are not true. *Cf., Kelcey v. Takers Co.*, 217 F.2d 541, 546 (2d. Cir. 1954)(Frank, J.). *Compare Burlington Indus., Inc. v. Dayco Corp*., 849 F.2d 1418, 1422 (Fed. Cir. 1988)("the habit of charging inequitable conduct in almost every major patent case has become an absolute plague."). And so we turn to the facts of this case, sensitive to the realization that hyperbolic statements in briefs do not resolve concrete cases. *Belleau v. Wall*, 811 F.3d 929, 938 (7th Cir. 2016). *See Upjohn Company v. United States*, 449 U.S. 383, 390 (1981); *Sandra T.E. v. South Berwyn School Dist*. 100, 600 F.3d 612, 619 (7th Cir.2010).

**B.**

Under Section 10(j) of the National Labor Relations Act, a district court is authorized to enter "just and proper" injunctive relief pending the final disposition of an unfair labor practices claim by the N.L.R.B. 29 U.S.C. § 160(j). The reason there must be two proceedings moving along parallel tracks in the federal court and before the N.L.R.B. is because Congress has decided that the N.L.R.B. often cannot accomplish its responsibilities in time to make a difference. The N.L.R.B.'s often languorous pace has caused the Seventh Circuit to call it "extraordinarily slow," *Lineback v. Spurlino*

*Materials, LLC*, 546 F.3d 491, 500 (7th Cir. 2008), and "notoriously glacial." *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 570 (7th Cir. 2011). Yet, "[t]he longer that an employer is able to chill union participation or avoid bargaining with a union, the less likely it is that the union will be able to organize and to represent employees effectively once the N.L.R.B. issues its final order." *Spurlino Materials*, 546 F.3d at 500. Thus, the need for prompt judicial review of the Petitioner's request ordering MTIL to bargain in good faith with United Electrical, Radio and Machine Workers of America, Local 1103 over the terms of its employment of its production and maintenance workers and for an injunction ordering MTIL to reinstate an employee it has fired, Bobby Frierson, a union organizer.[1]

Under 10(j) and the applicable case law, relief is "just and proper" when four factors are present: (1) the N.L.R.B. has no adequate remedy at law; (2) the union will be irreparably harmed without interim relief, and that potential harm to the union outweighs potential harm to the employer; (3) public harm would occur without the relief; and (4) the N.L.R.B. has a reasonable likelihood of prevailing. *Harrell ex rel. N.L.R.B. v. Am. Red Cross, Heart of Am. Blood Servs. Region*, 714 F.3d 553, 556 (7th Cir. 2013); *Irving Ready–Mix, Inc.*, 653 F.3d at 570; *Spurlino Materials*, 546 F.3d at 500; *Bloedorn v. Francisco Foods, Inc.,* 276 F.3d 270, 286 (7th Cir. 2001). The Petitioner bears the burden of establishing the first, third and fourth of these circumstances by a preponderance of the

---

[1] The Act states in relevant part that:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

evidence. *Spurlino Materials*, 546 F.3d at 500; *Francisco Foods,* 276 F.3d at 286. The second prong is evaluated on a sliding scale: the better the Petitioner's case on the merits, the less its burden to prove that the harm in delay would be irreparable, and *vice versa*. *Spurlino Materials*, 546 F.3d at 500; (7th Cir. 2008); *Francisco Foods,* 276 F.3d at 286-87.

While "[a]n injunction granted under section 10(j) is an 'extraordinary remedy' and should be granted only in those situations in which effective enforcement of the Act is threatened by delay in the Board's dispute resolution process, in order to demonstrate a reasonable likelihood of success on the merits, *Irving Ready-Mix*, 653 F.3d at 570, the Petitioner need only show the "evidence [i]s sufficient to establish a better than negligible chance of success on the merits." *Spurlino Materials,* 546 F.3d at 503; *N.L.R.B. v. Electro–Voice,* 83 F.3d 1559, 1570 (7th Cir. 1996). Things are made more difficult by the Petitioner asking the court to rule based on the hearing transcript and exhibits taken at the administrative hearing, when not even the ALJ has not yet ruled. In that context, a court is prohibited from making credibility findings, even though the outcome of most cases depends upon a resolution of competing versions of events given by interested witnesses, often willing to dissemble when it is to their advantage. *Schmude v. Tricam Industries*, *Inc*. 556 F.3d 624, 628 (7th Cir. 2009). Under the Act, credibility determinations are the exclusive province of the N.L.R.B., acting though the ALJ, who heard the testimony and observed the witnesses. *Spurlino Materials*, 546 F.3d at 491; *Francisco Foods*, 276 F.3d at 287. The law recognizes that "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). *See also, Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. N. L. R. B*., 547 F.2d 575, 592 (D.C. Cir. 1976). Or as Justice Jackson succinctly put it, "a few minutes' observation in the courtroom is more

informing than reams of cold record." *Ashcraft v. State of Tenn*. 322 U.S. 143 (1944)(Jackson, J., dissenting).

Yet, even though the court cannot consider credibility, it is charged with predicting what the N.L.R.B.'s ultimate conclusion likely will be. *Spurlino Materials*, 546 F.3d at 503 (describing the court's task as making "a predictive judgment about how the N.L.R.B. is likely to rule."); *N.L.R.B. v. Q-1 Motor Exp., Inc*., 25 F.3d 473, 477 n.3 (7th Cir. 1994)("The court therefore must attempt to predict what the eventual outcome of the N.L.R.B.'s proceedings will be and to act accordingly. If the eventual outcome turns out to be different from what was predicted, however, it is obviously the prediction, not the outcome, that must be rejected."). In a case dominated by conflicting versions of events from various witnesses, the ALJ's decision will involve multiple credibility findings. Not surprisingly, at least based on the cases to which the Petitioner has called the court's attention, these predictions don't have a track record of being especially accurate or consistent, especially when made prior to the ALJ's decision. *See, e.g., Electro-Voice,* 83 F.3d at 166 (ALJ's conclusion directly contradicted conclusion court made, based on the transcript of the administrative hearing, one month earlier); *Francisco Foods, Inc*., 276 F.3d at 284(two months after the district court denied the Director's petition for interim relief on dry record, the ALJ ruled the other way); *Q-1 Motor Exp., Inc*., 25 F.3d at 477 n.3 (district court's ruling different than eventual ALJ determination). When there is an ALJ's decision already in hand, the matter becomes simpler, as the court is obligated to "give some measure of deference to the view of the ALJ in determining the likelihood of success." *Francisco Foods*, 276 F.3d at 288. After all "[t]he ALJ is the Board's first-level decisionmaker. Having presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed." *See also Spurlino*

*Materials*, 546 F.3d at 502–503.

Along those lines, the Petitioner tells us that in proceedings like this one, the court "should give the [petitioner's] version of the disputed facts the 'benefit of the doubt' and should accept the reasonable inferences he draws from the facts if they are 'within the range of rationality,'" quoting from the 41 year-old *Squillacote v. Graphic Arts Int'l Union, AFL-CIO*, 540 F.2d 853, 858–59 (7th Cir. 1976). [Dkt. #15, at 3]. But that is to ignore the importance of the role credibility plays and to effectively demand almost all cases be decided in favor of the N.L.R.B. Also, *Graphic Arts* was about a Section 10(l) injunction, not a 10(j) injunction. 540 F.2d at 858. In the context of a 10(j) case, which is what we are concerned with here, the most recent Seventh Circuit comment on whether the Petitioner should be entitled to "the benefit of the doubt" appears to be in *Electro-Voice*, 83 F.3d at 1567, where the court refused to determine whether the Petitioner's view of the facts was entitled to such deference and explained that the concept came from 10(l), not 10(j), cases. 83 F.3d at 1567 n.16. The only deference the Seventh Circuit has said was applicable to a view of the facts is "some measure of deference" to the ALJ's view, *Am. Red Cross, Heart of Am. Blood Servs. Region*, 714 F.3d at 556, and, as already stated, the Petitioner doesn't yet have the ALJ's decision. As a result, we wade into the often diametrically opposed stories about working and union organizing at MTIL's facility at a bit of a disadvantage, and we attempt to predict what might happen before the N.L.R.B.

**C.**

Petitioner tells us that a union organizing campaign among MTIL's production and maintenance employees began in mid-October 2016, and resulted in the union filing a petition to represent MTIL's employees on November 20th. Petitioner claims that immediately after the election

petition was filed, MTIL engaged in a continuous and pervasive campaign to quash the union activity of its employees. For example, the Petitioner claims that in early December after employee, Willie Stevens, began wearing a union button, he was "unlawfully interrogated" by plant manager, Cornelius Chandler. [Dkt. #20, at 3]. But Petitioner cites to no evidence[2] of this "interrogation" in the record, and *ipse dixits* of counsel don't count. *See IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.,* 437 F.3d 606, 610-611 (7th Cir.2006); *United States ex rel. Feingold v. AdminaStar Federal, Inc.,* 324 F.3d 492, 494, 497 (7th Cir. 2003); *Car Carriers Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984). In fact, when asked what Chandler told him would happen if a union came in, Stevens testified that he "[couldn't] recall." (R. 206). Then N.L.R.B. counsel asked him if Chandler "mention[ed] the company relocating if the union came in," Stevens answered, "[s]omething like that, he was saying. It's a possibility –." (R. 206).[3]

---

[2] This is a tack that Petitioner, unfortunately, takes throughout. The transcript is over 700 pages long. Documentary evidence puts the record at well over 1000 pages. While an attorney who has lived a case may know with precision where in a record certain points are made, a judge, with no similar familiarity with the materials, cannot. That is why, time and again, the Seventh Circuit has that warned attorneys that arguments unsupported by citations to the record need not be considered. *Rahn v. Bd. of Trustees of N. Illinois Univ.*, 803 F.3d 285, 294 (7th Cir. 2015)("As we have oft-stated, 'we will not root through the hundreds of documents and thousands of pages that make up the record here to make [plaintiff's] case for him.'"); *Spitz v. Proven Winners N. Am., LLC,* 759 F.3d 724, 731 (7th Cir. 2014)(". . .'[a] brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record.'"); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)("Judges are not like pigs, hunting for truffles buried in the briefs.").

[3] A leading question, even though proper where a witness claims a lack of recall, often provokes an unreliable or at least suspect response. *United States v. Campbell*, 659 F.3d 607, 612 (7th Cir. 2011), *rev'd on other grounds*, 568 U.S. 802 (2012). Of course, this involves a determination of credibility, *Stine v. Marathon Oil Co.*, 976 F.2d 254, 266 (5th Cir. 1992),which is beyond our charge here.

"Employers . . . violate § 8(a)(1) when they interrogate employees about their union activities in circumstances that tend to interfere with organizational efforts." *Electro-Voice*, 83 F.3d at 1570. Petitioner does not develop this point or explain what was asked of Stevens or how it was asked. [Dkt. #20, at 3].

A former MTIL employee, Tonia Zekas, testified that she overheard plant manager, Ramon Haya-Trueba, ask one of the employees, Labrie Ousley, to get his line to vote against unionizing. Zekas said that Ousley told Haya-Trueba "he would be working on that." Haya-Trueba told Ousley he would give him $500 if his line voted against the union, and gave him three t-shirts. (R. 37). Zekas explained that the t-shirts, which were green, meant a pay increase for Ousley of $1.25 per hour. (R. 38). While Zekas testified that Haya-Trueba writes in Spanish and prefers to speak Spanish over English, she said this exchange, which she claims she overheard through a two-inch gap in the wall between offices, was in English. (R. 35, 36, 78). Haya-Trueba, the plant manager, who testified through an interpreter at the hearing said that he spoke very little English – "loose words" like "hello" or "good morning," that he never had this interaction with Ousley and that one could not hear, or at least not understand, conversations through the wall. (R. 632, 626).

Temporary employee, Tasha Lee, testified that in early December she saw plant manager, Chandler, in the break room. She said he picked up a union flyer and "[h]e was like, if the union wins, there's going to be a lot of people getting fired." (R. 336). There may have been one other person in the break room, but Lee could not recall. (R. 335). An MTIL employee, Matthew Wilmot, testified that plant manager, Haya-Trueba, asked him if he had signed a union flyer. (R. 324).

On December 7, 2016, MTIL held an employee meeting. Edgardo Villanueva, a consultant MTIL engaged for labor relations, testified that the idea was to educate the employees about the "nuances" of union membership. (R. 675, 686). While the union flyers told them they would get more money if they voted union, Villanueva explained this wasn't always the case. (R. 686). Oscar Bendezu, who started working for MTIL in March 2016 and attended the first-shift meeting, called Villanueva "the guy from union buster." (R. 309). Bendezu was pro-union; he wanted a union

because "[t]he way they talk to us. They force us to do what we doing. It was real harassment at that time . . . ." (R. 262). Bendezu, who understood both Spanish and English, testified that Haya-Trueba told the employees in Spanish "[t]hat he probably would move if the union win." (R. 310). Bendezu didn't know if he meant himself or the company. (R. 310). Villanueva translated this into English and, again, Bendezu didn't know if they meant him or the company would move. (R. 310).

Bobby Frierson, a union organizer and employee, who was fired and who is the centerpiece of this case, testified that on December 9, 2016, "Mr. Ramon" – Frierson didn't know Haya-Trueba's last name – asked him what he could do to get the union not to come in. (R. 152). Frierson said he told him it was too late. (R. 153). Frierson testified that a couple of days later, on December 12, Haya-Trueba told him that the picture of him on a pro-union flyer was "nice." (R. 160). Frierson said Chandler told him, that "[e]verybody is not going to make it. The important people, yeah, we can take care of them, but we can't take care of everyone. Maybe on the next go around we can, but I can take care of you." (Tr. 162). Chandler told Frierson he was one of his favorites. (R. 162). When counsel asked whether Chandler wanted anything in exchange, Frierson answered: "he didn't say it, but he was saying – it was pretty much to vote no for the union." (R. 162). Frierson testified that he then told Chandler, "instead of offering me a $3 raise, there's six people in line. You could give everybody 50 cents." (R. 162-63). When counsel asked when Chandler had offered the $3 raise, Frierson explained: ". . . . He didn't actually say, here is a $3 raise. He said we can give you a raise." (R. 163). Frierson then said there was no exact number, and he wouldn't have believed him anyway. (R. 163).

Plant Manager, Chandler, testified that, later that day, MTIL distributed bonuses, and for the first time six employees received payments of $100. (R. 511). Haya-Trueba testified that he didn't

grant any bonuses at that time. (R. 624). Villanueva testified that, at the meeting, Haya-Trueba told the employees the company "would be looking at the possibility of pay . . . for the up[coming] holiday, which was Christmas . . . ." (R. 696). Plant Manager, Haya-Trueba "absolutely [did] not" tie this to the upcoming election. (R. 696). Haya-Trueba, testified that they began paying for all holidays when, at Thanksgiving, they received many complaints about it. (R. 623).

On December 14, just two days prior to the scheduled election, MTIL held another meeting at which, according to Bendezu, Haya-Trueba told employees that "he's [going] to do drug tests and stuff like that [and] if [you] don't pass the test everybody is going to be out" and "he's going to start paying for holiday[s]." (R. 312). Villanueva said the subject of drug tests "absolutely [did] not" come up. (R. 695-96). Stevens testified that Villanueva translated Plant Manager, Haya-Trueba, as saying testing "may be a possibility if people use drugs – ." (R. 208). Crishonna Collins, who began with MTIL in August 2016, said Villanueva translated Haya-Trueba as telling the employees that "[t]he voting for the union was cancelled," and "if the union would have come in everybody would have been drug tested and also if the union came in the whole place would shut down." (R. 347).

The main focus of this case, however, is the termination of union organizer Frierson on December 14, 2016, shortly before the vote. The reasons given for his termination on his "Employee Exit Form" were "[t]hreatening to conduct an act of violence against another employee. [He] displayed insubordinate behavior when he failed to exit the facility after direction. The employee also made verbal threats to associates." (G.C. 70). The testimony regarding Frierson's conduct are these: Frierson testified that, on December 13, 2016, he was standing around by the time clock with two other employees when Chandler asked him if he got paid to stand around. (R. 164-65). Obviously, this was not a question, but an expression of sarcasm and displeasure. Frierson, who

according to his picture was an African American, sarcastically responded, "no sir, *boss*." (R. 165)(Emphasis supplied). Chandler thought Mr. Frierson was being patronizing and asked if he thought he was funny, and, again, Frierson responded, "no sir, *boss*." (R. 145)(Emphasis supplied). Frierson wasn't sure whether Chandler then said he was would write him up or that he was merely giving him a verbal warning. (R. 145). But it was one or the other. Nonetheless, according to Frierson, he continued along the same lines:

> I said, is there anything else you need me to do, *boss*? I said, no sir, *boss*. Is it okay if I go back and do the job you say you pay me for, *boss*?

(R. 145)(Emphasis supplied).[4]

Despite Mr. Frierson's obvious taunting and his intentionally insulting and provocative remarks, Chandler testified that he gave Frierson only a verbal warning because, he needed him to be in his work area during the shift. (R. 482). The story of this exchange, much of it admittedly coming from Frierson, himself, is likely to be credited by the ALJ. And Frierson did not challenge what Chandler said. Chandler then testified that he had a second shift meeting. While the meeting was in progress, he heard loud knocking on the door; it was Frierson. (R. 483-84). According to Chandler, Frierson said, "[w]here's my verbal. Fuck that. I want my verbal." (R. 484)(Emphasis supplied). Frierson admitted that he interrupted the meeting so he could get his "write-up because

[4] One is reminded of Justice Jackson's famous observation in *Kunz v. People of State of New York*, 340 U.S. 290, 299 (1951)(dissenting opinion): "These terse epithets come down to our generation weighted with hatreds accumulated through centuries of bloodshed. They are recognized words of art in the profession of defamation. They are not the kind of insult that men bandy and laugh off when the spirits are high and the flagons are low. They are not in that class of epithets whose literal sting will be drawn if the speaker smiles when he uses them. They are always, and in every context, insults which do not spring from reason and can be answered by none."

[Chandler] said he wrote [him] up . . . ." (R. 167). Again, Chandler had just given him a verbal warning, as he explained in his testimony. (R. 484). He testified that he left his meeting and told Frierson, who was then in the office, that he had said it was a verbal warning and he wasn't going to write him up. (R. 484). During his testimony, Frierson agreed that Chandler had told him he wasn't writing him up. (R. 148). The Petitioner concedes there was no write-up, only a verbal warning. [Dkt. #20, at 6].

Mr. Frierson was angry because Chandler, he testified had "made a scene out there," and he demanded a write-up instead of a verbal warning. (R. 168). Mr. Chandler testified that he and Lionel Hudson– the human resources administrator – asked Frierson to leave the office because Frierson was so irate. (R. 484). Chandler testified Frierson stood in the corner of the office and then came toward him with a clenched fist; Chandler said he felt threatened. (R. 484). As Hudson described it, Frierson was upset, the two were close together, and body language led him to believe things could escalate. (R. 426). Body language, of course, can be meaningful. *See, e.g., Skilling v. United States*, 561 U.S. 358, 386 (2010); *United States v. Olano*, 507 U.S. 725, 739 (1993)*; United States v. Wing*, 104 F.3d 986, 988 (7th Cir. 1997). Hudson got between them. (R. 426). Chandler testified that he told Frierson to leave, but he would not. (R. 484). Someone grabbed Frierson and someone grabbed Chandler. (R. 484). According to Frierson, Chandler told him to leave the building, and he simply left without any further confrontation. (R. 168). Stevens testified that, from what he saw, Chandler and Frierson were arguing about whether Chandler had said Frierson would be written up or whether it had just been a verbal warning; Chandler told him to leave, and Frierson left. (R. 216).

Gerald Bradley, a forklift lead with MTIL, essentially corroborated Chandler's version of the exchange. He said Frierson interrupted the meeting and was very disruptive. (R. 553). He further testified that Chandler avoided Frierson and went on with the meeting. (R. 554). Then, out in the office after the meeting, he said:

> Bobby [Frierson] came in. He was loud. You know, aggressive, and him [sic] and [Chandler] started arguing again. You know, it got very, very intense, very extreme, you know, to the point Bobby was so upset and angry you couldn't even say nothing to him. You know, he got very close, in close proximity to [Chandler], you know, rearing up at him to the point where I just was like, man, what you doing? I told him, you tripping. He wasn't trying to hear anything. He waved me off. Said something to me. You know, yelled something to me.
>
> From that point [Hudson], I think, came out of his office. You know, everyone just basically tried to, you know, get Bobby to calm down to get him up out the office, separate him and [Chandler].

(R. 554).

Bradley testified that, right after that, Frierson made hostile gestures toward another employee, who happened to be Bradley's nephew. (R. 555). Hostile gestures have meaning. *Bott v. U.S. Airways, Inc.*, 2009 WL 1686801, at *3 (W.D.N.C. 2009).

Frierson testified that when he left the building he went to the parking lot where he met Sean Fulkerson from the Union. (R. 169). It seems he had arranged to meet with Fulkerson at this time, but it's not entirely clear. (R. 169). Frierson testified that he wanted to have a conversation with him about the incident that had just happened. (R. 169). According to Frierson, he had punched out at his usual time, 2:15 p.m. (R. 170). Apparently while he was meeting with Fulkerson – it's unclear – a number of employees surrounded him and threatened to kick his ass. (R. 172). One of them was Bradley. Frierson testified that he told Bradley his issue wasn't with him "because [Chandler] is his henchman." (R. 2). Fulkerson then told Frierson, "that's not how you beat them," and Frierson

testified he then calmed down. (R. 173). Frierson testified that a security guard then approached him and after being told to leave the parking lot, he did. (R. 174).

Frierson testified that he reported to work the next day and was called into the office. (R. 174). There, he met Chandler, Hudson, and the security guard. Hudson told him he was suspended pending an investigation. (R. 175). The "Disciplinary Action Report," which he signed, said that he was insubordinate when told to stop talking to other employees and return to work, approached his supervisor in a threatening manner, and threatened another co-worker. The report also said that Frierson had engaged in a "[t]hreat of violence" when he approached his supervisor in a threatening manner and also threatened other co-workers verbally. (G.C. 71). Hudson called him later that evening and told him he was terminated. (R. 180). The Employee Exit Form, which was not signed by Frierson, stated that he threatened to commit an act of violence against another employee, and that he displayed insubordinate behavior when he failed to exit the Facility and also made verbal threats to associates. (G.C. 70).

**D.**

**Likelihood of Success on the Merits**

The Petitioner makes several charges of anti-union animus that he says are "clearly demonstrated" by the record and show he has a "strong likelihood of success" on the merits. But Petitioner's characterization of the evidence as "clear" is not supported by the record. The evidence, which consists of the testimony of various employees and managers provides, for the most part, opposing versions of the facts. In cases presenting conflicting versions of events, the outcome "depends greatly upon nuanced credibility determinations...." *JH ex rel. JD v. Henrico Cty. Sch. Bd.*, 395 F.3d 185, 197 (4th Cir. 2005). Indeed, without the ability to make credibility judgments, in most

cases it would be exceedingly difficult if not be impossible to say that one side or the other had shown  that the version of events sponsored by one party had been shown to be "clearly" true or "clearly" false. Fortunately for the Petitioner, he doesn't have to establish anything "clearly."All he need show in this case is that he has a "better than negligible" chance of succeeding on the merits before the N.L.R.B. *Spurlino Materials*, 546 F.3d at 503 (7th Cir. 2008); *Electro–Voice,* 83 F.3d at 1570.

"Better than negligible" is not much of a hurdle to negotiate. *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ*., 858 F.3d 1034, 1046 (7th Cir. 2017). In *Electro-Voice*, for example, the district court denied the Petitioner an injunction, because it concluded "the evidence of unfair labor practices [wa]s 'equivocal' or 'unclear.'" 83 F.3d at 1568. Although the employer presented "a plausible explanation" for its actions and "compelling evidence in support of its case," 83 F.3d at 1570, the Court of Appeals reversed, noting that the timing of discharges and the manner in which the terminations were carried out, viewed in the light of the evidence suggesting that the company engaged in other anti-union practices and acted with anti-union animus, establish that the Director has "a better than negligible chance of prevailing on the merits." But, the Court emphasized, its decision should not be deemed as an expression of opinion on the merits of the case, itself. Indeed, it stressed that its "holding should not be taken as a finding in favor of the Director on the merits." It noted that the defendant had offered a "plausible explanation for the terminations, and presented compelling evidence in support of its case." It emphasized  that there were credibility questions regarding witnesses and that its inquiry is limited to whether the Director has a better than negligible chance of success. *Electro-Voice, Inc.,* 83 F.3d at 1570. As in *Electro-Voice*, there are obvious credibility questions affecting both sides, and it's up to the ALJ to assess credibility in this

case. Could the ALJ believe enough of the Petitioner's witnesses and enough of their testimony to find for the Petitioner? The answer is "yes." But so much hinges on the credibility of the witnesses.

First, Petitioner argues that the record "clearly demonstrates" [Dkt. #20, at 3] threats that if the union won the company would shut down or relocate. Threatening plant closure or other reprisals for union activity violates §8(a)(1), because "these acts reasonably tend to coerce employees in the exercise of their rights, regardless of whether they do, in fact, coerce." *Electro-Voice*, 83 F.3d at 1570. But, the testimony that the Petitioner relies on doesn't "clearly demonstrate" any such thing. When asked what Chandler told him would happen if the union came in, Stevens said he didn't remember. It was only when prompted by N.L.R.B. counsel that Stevens said, "something like that." (R. 206). When Bendezu testified about relocation threats, he said that Haya-Trueba had told employees at a meeting that he "probably would move" if the union won. But, Bendezu said he didn't know whether Haya-Trueba meant he would move personally or the company would relocate. (R. 310). So, he didn't consider it a threat. Collins testified that Haya-Trueba said three things: the union election was cancelled, if the union won everyone would be drug-tested, and if the union won, the plant would close. (R. 347).

It's improbable that Haya-Trueba told the employees the election was cancelled; no other witness testified he said anything remotely like that.[5] If the plant closed, the employees certainly weren't going to be drug-tested by MTIL. None of this "clearly establishes" the Petitioner's view of the facts. But, that's not the question. The question is whether the Petitioner has a better than negligible chance of success before the ALJ and the N.L.R.B. The testimony of the Petitioner's

[5] Actually, Haya-Trueba cancelled nothing; the Union and the N.L.R.B. cancelled the election the day after this meeting, December 15, because charges had been filed before the N.L.R.B. (G.C. 65).

witnesses was not "inherently incredible" and thus, cannot be rejected on that basis. *See Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)("the story itself may be so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it."); *Schandelmeier-Bartels v. Chicago Park District*, 634 F.3d 376 (7th Cir. 2011)(a district court can disregard testimony if reasonable persons could not believe it because it contradicts indisputable physical facts). *See also Latino*, 58 F.3d at 315; *Electro-Voice*, *supra,* 83 F.3d at 1571; *Geighy Chemical Corp. v. Allen*, 224 F.2d 110, 114, n.5 (5th Cir. 1955). In the instant case, there is a more than negligible chance that the ALJ will believe the Petitioner's witnesses. It would be an error to deny the Petitioner relief simply because of conflicting testimony and credibility issues – issues that exist in every case that goes to trial. *Compare Whitehead v. Bond*, 634 F.3d 919 (7th Cir. 2012).

Maybe Zekas – a disgruntled former employee[6] – did hear Plant Manager, Haya-Trueba, through a gap in the wall between their offices, and he was speaking English to Ousley. Maybe he did give Ousley t-shirts and a raise. Zekas said she sent the paperwork through to payroll; Petitioner hasn't pointed to any documentary evidence of that. [Dkt. #20, at 4]. While the ALJ might well not credit some or all of this testimony, there's at least some chance – a better than negligible chance – that the ALJ will believe what the witness said she overheard, and "granting benefits with an eye toward curbing union organization violates § 8(a)(1)." *Electro-Voice*, 83 F.3d at 1570.

[6] Zekas testified that she was fired for being late for work too often but claimed she wasn't aware that she had been. (R. 41). Zekas is also the only witness from the administrative hearing to testify that Haya-Trueba spit on or shoved employees every week, and that Chandler physically assaulted 15 different employees. (R. 48-49). Exaggeration is not an indicia of truthfulness. *Mei Zhen Huang v. Mukasey*, 256 Fed.Appx. 406 (2nd Cir. 2007); *United States v. Lopez*, 2016 WL 7337548, at *3 (S.D. Tex. 2016); *Gray v. Michael*, 2016 WL 6403509, at *9 (D. Md. 2016). Nor is implausibility. *Electro-Voice, Inc.*, 83 F.3d at 1569.

Most of the petitioner's focus is on the altercation between Frierson and Chandler and the subsequent termination of Frierson. The *pas-de-deux* is described differently by the two men, but not entirely. Of course, there is no certainty whom the ALJ will believe, and the difficult task of assessing credibility of witnesses, as already explained, is not a part of the present exercise. We did not see or hear the testimony, which is all important. But, overall, the testimony of the two men indicates agreement that Frierson was milling around and Chandler told him to get back to work. Rather than simply complying, Frierson delayed and began goading Chandler by playing the obsequious underling, using language that all would interpret as racially charged and inflammatory and provocative: "yes sir, boss . . . no sir, boss . . . anything else, boss."[7] Frierson, himself, basically admitted his behavior. Chandler asked if Frierson thought he was funny, and issued a verbal warning. Clearly, and contrary to the Petitioner's assertions, discipline – especially the minor discipline involved – was not "unwarranted." [Dkt. # 22, at 11]. Frierson admitted conduct that was intended to be provocative and insulting.

Although Frierson and the Petitioner concede that Chandler gave only a verbal warning, Frierson decided to escalate things and demand a write-up. So he interrupted a meeting, and then confronted Chandler in the office. By all accounts, the encounter was aggressive and confrontational, with Chandler telling Frierson there had only been a verbal warning and Frierson demanding a write-up in any event. Plant Manager, Chandler, who explained the circumstances under which the encounter with Frierson occurred, understandably felt threatened. The Petitioner never explains why,

[7] Petitioner claims that this demonstrates that "at no point did Frierson refuse to follow a directive of his supervisor or engage in insubordinate conduct." [Dkt. #22, at 3]. But Frierson's own testimony shows that, when told to get back to work, rather than return to his work station, he went into his "yes sir, boss," " no sir, boss," "anything else, boss" routine before finally complying.

if, as is now conceded, the warning was merely verbal, Frierson, was so adamant and made a scene about and demanded a write-up. Frierson's behavior could not responsibly have been ignored, and it is his behavior and the language he chose showed quite clearly he did not want it to be.

It seems more than a happy coincidence that the organizer from the union, Fulkerson, was waiting for Frierson in the parking lot after this fateful shift. Of course, it may not been preplanned. But the timing seems more then fortuitous, and a confrontation and a *write-up* of a union organizer over nothing more than dawdling, for that is how it began, would serve a beneficial purpose in the union campaign. Of course, all this is for the ALJ. But one thing is not open to serious question: Frierson chose to exacerbate the situation and escalate the controversy at every opportunity. At any point, it would seem, he could have not only have staved off being fired, but receiving any discipline at all. When told to get back to his work station, he did not, choosing to mock Chandler in racially charged and insulting and demeaning language. When given a verbal warning, he chose to confront Chandler, and he demanded a higher degree of discipline: a write up. This was all Frierson's doing as all the witnesses in essence testified.

**E.**

Section 8(a)(3) of the National Labor Relations Act prohibits employers from terminating employees "*solely* on the basis of their union activities or sympathies." *Electro-Voice*, 83 F.3d at 1568 (citing 29 U.S.C. § 158(a)(3))(Emphasis supplied). Thus, the employer's motivation for terminating an employee is critical to the determination whether the termination violates the NLRA. *Electro-Voice*, 83 F.3d at 1568; *N.L.R.B. v. So-White Freight Lines, Inc.,* 969 F.2d 401, 406 (7th Cir.1992). The Petitioner has the burden of proving by a preponderance of the evidence that the terminations were motivated by a desire to thwart protected activity. *Chicago Tribune Co. v.*

*N.L.R.B.,* 962 F.2d 712, 716 (7th Cir.1992). If the Petitioner carries that burden, the burden shifts to the employer to demonstrate by a preponderance of the evidence that it would have terminated the employees irrespective of the protected activity. *Id.* at 718. *See also*, *Electro-Voice*, 83 F.3d at 1568; *Northern Wire Corp. v. N.L.R.B.,* 887 F.2d 1313, 1318 (7th Cir.1989).

There is no dispute that Chandler and management knew of Frierson's involvement in the union. At the same time, it was Frierson, not Chandler, who escalated the altercation to the point of no return. That's a problem for the Petitioner since the termination has to be motivated *solely* by anti-union animus, as the Seventh Circuit held in *Electro-Voice.* The evidence supports the conclusion that MTIL did have a more than sufficient, non-union reason to fire Frierson – namely, his exceedingly insubordinate, aggressive and threatening behavior toward another worker and toward one of MTIL's managers. In *Electro-Voice*, the Seventh Circuit emphasized that the circumstances surrounding Shaffer's termination were sufficiently distinct to warrant separate consideration from other firings. Electro-Voice presented evidence that Shaffer "destroyed several thousand dollars worth of equipment, and would have been terminated regardless of his union activity." 83 F.3d 1570 at n. 17. The Seventh Circuit "concur[ed] with the district court that the Director ... failed to establish a better than negligible chance that an anti-union animus motivated Shaffer's termination." So too here.

But the Petitioner ignores all of this and insists that the firing of Frierson was illicit because an individual who had had a physical altercation over a cellphone with a co-worker, who happened to be his pregnant girlfriend, only received a 3-day suspension. Significantly, the girlfriend, who apparently started the whole thing, received the same suspension as the boyfriend. (R. 51-53, 56).

The boyfriend was not fired because the Company needed him on the line. (R. 58).[8] Also ignored is the fact that both suspensions were recommended by Ms. Zakis, the Petitioner's witness at the hearing. It should be parenthetically noted that three other employees had previously been discharged for fighting, while some others were merely disciplined. (R. 45). Chandler said that, in his opinion, Frierson's behavior was worse than the altercation over the cell phone. (R. 530). Of course, the issue is not what Chandler believed, but whether an employer like MTIL is bound by an earlier episodic disciplinary decision so that it could not issue any greater punishment to an employee who had conducted himself as Frierson had without being subject to the kind of claim the Petitioner is now making. While evidence of the earlier 3-day suspension may be relevant to the motive underlying the discipline meted out to Frierson, it is not conclusive or limiting by any means. Nor should it be.

Apart from the fact that comparisons are necessarily inexact, punishment in one setting does not demand that it be repeated in a different setting, lest there be a finding of illicit motivation. Infractions affecting multiple people and involving different and multiple forms of misconduct can be treated differently than misconduct of a different nature. After all, to be an appropriate comparator requires that the comparator be similarly situated to the person to whom the comparison is being made, *Hanners v. Trent*, 674 F.3d 683, 692 (7th Cir. 2012), which, in this case, means they have a "comparable set of failings...." *Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 509 (7th Cir. 2017). Here, MTIL could reasonably believe that the comparators were not similarly situated for the reasons previously discussed. And finally, that MTIL may have seen the situations differently

[8] We cannot make credibility judgments; but it maybe noted that the witness claimed that the father had threatened to kill the baby over the cellphone. It was she who recommended the suspension. (R. 51-56).

than does the Petitioner does not mean the Petitioner has shown a better than negligible chance of success on its claim that the firing had a prohibited motivation. *Cf., Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016). Employers, it must be remembered, even have the prerogative to be "shortsighted and narrowminded."

Under the circumstances that exist in this case, where Frierson was intentionally insubordinate and threatening to multiple people over a somewhat extended period of time and his misbehavior was directed to management and workers alike, MTIL had ample reason for firing Frierson unrelated to a desire to thwart or curtail union activity. As in *Electro-Voice, Inc.*, "the Director has failed to establish a better than negligible chance that an anti-union animus motivated [the Frierson] termination." 83 F.3d at n. 17.

**F.**

While the Petitioner has enough to show he has a "better than negligible" chance of succeeding on the merits before the N.L.R.B., *Spurlino Materials*, 546 F.3d at 503 (7th Cir. 2008), *Electro–Voice,* 83 F.3d at 1570 – it's a particularly onerous burden – *Whitaker By Whitaker*, 858 F.3d at 1046 – his case is not especially strong. The testimony was equivocal or contradictory or, some might find, in some instances, arguably implausible. Even if that were not the case, witnesses for one side adequately disputed witnesses for the other. If this were Petitioner's motion for summary judgment, the motion would be denied. *See Bloedorn*, 276 F.3d at 287 (comparing process to summary judgment proceeding). That's because all, or nearly all of this case hinges on the credibility of the various witnesses, *see Orton Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014), a matter beyond our statutory authority to resolve.

While the present case is not a motion for summary judgment, the nature of Petitioner's case means that he must make a stronger showing of irreparable harm if he is not granted the relief he requests. *Spurlino Materials, LLC*, 546 F.3d at 500; *Bloedorn*, 276 F.3d at 286-87. First, we shall apply that calculus to the Frierson termination. The Petitioner seeks an order requiring MTIL to reinstate Frierson and submits that if relief is not granted, unionization will suffer irreparable harm. Petitioner calls him "the primary Union leader [at] the facility." [Dkt. #20]. Notably, in the 30-year-old case Petitioner relies upon to support Frierson's reinstatement, *Gottfried v. Frankel*, 818 F.2d 485, 496 (6th Cir. 1987), the Petitioner presented *evidence* of the important role the fired employee played in developing union support, as well as evidence of a drop in union membership. *Id*. at 496. In *Electro-Voice*, one-third of the workforce in the Indiana plant was fired, which had a substantial chilling effect on union activity in the Indiana plant. 83 F.3d at 1572. Here, nothing of the kind occurred, and Petitioner directs the court to no evidence or testimony to suggest Frierson is the *key* union organizer. Petitioner claims that, since his discharge, "[e]mployee attendance at organizing meetings has significantly dwindled." [Dkt. #20, at 11]. Petitioner points to some sign-in sheets from October, November, and December of 2016, and one from March of 2017. Attendance at the meetings prior to Frierson's discharge was 8, 15, 8, 10, 17, 17, and 14. Afterward, it was 7 and 9. (G.C. 74, 75). Arguably, a drop in attendance from an average of about 12 to an average of 8 is "significant[]." But, as we point out in note 9 below, the evidence suggests an actual increase in attendance following the termination of Frierson's employment.[9] In any event, one must be careful

---

[9] Petitioner says union support has eroded "since [the alleged anti-union campaign in November . . . ." [Dkt. # 20, at 11]. Attendance at meetings on October 25, 26, and November 2, 16 was 8, 15, 8, 15, and 10; attendance on November 30, and December 7 and 14, was 17, 17 , and 14. (G.C. 74). Contrary to the Petitioner's characterization, after November, support, or at least interest, actually rose.

continue...

of *post hoc ergo propter hoc*, which, as Judge Easterbrook reminds us, "is the name of a logical fallacy, not a means to prove causation." *Loudermilk v. Best Palate Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011).

The only evidence as to union leaders at MTIL – evidence that petitioner does not cite [Dkt. #20 at 12-14] – is a flyer listing Frierson, not as the primary union leader, but merely one of four. (G.C. 73). Petitioner's Reply Brief indicates, again without citation to the record, that Bendezu is also a leader, making Frierson just one of five at a facility of 86 workers. [Dkt. #22, at 12, 14]. So, the Petitioner provides the court with nothing that shows that the termination of Frierson is the "disappearance of the 'spark to unionize.'" *Pye ex rel. N.L.R.B. v. Excel Case Ready*, 238 F.3d 69, 75 (1st Cir. 2001). Based on the evidence, Frierson continues to attend organizational meetings. (G.C. 75). Petitioner has simply not made a sufficient showing, let alone a strong enough showing,to balance the weaknesses of its case regarding Frierson, that the absence of Frierson on the plant floor will do irreparable harm to efforts at unionization.

Petitioner contends what Frierson did is protected under a 40-year-old N.L.R.B. case, *Atlantic Steel Co.*, 245 N.L.R.B. 814 (1979), because he is a union activist. But that's more than a stretch, and taken to the limits of its logic the argument would insulate a union worker simply by virtue of that status. In *Atlantic Steel*, the Board looked at four factors to determine if the discharged employee has lost the protection of the Act: (1) the place of the discussion; (2) the subject of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way,

---

[9]...continue

In *Lineback v. Printpack, Inc.*, 979 F. Supp. 831, 849 (S.D.Ind. 1997), the evidence showed that the defendant's conduct "was a dramatic public, and powerful attack against union activities." Indeed, the company fired Hancock "for protected acts that he performed as the union President." The firing of Frierson is not in any way comparable to what occurred in that case. Quite the contrary.

provoked by the employer. 245 N.L.R.B. at 816. At the time, Frierson wasn't engaged in protected activity. He had been given a verbal warning when, rather than return to his work area when directed, he went into his taunting "yes, boss; no, boss" routine. Again, clearly, the verbal warning was warranted. Unsatisfied with a verbal warning, Frierson escalated the situation on his own volition by demanding a written warning. This was in no way provoked by Chandler; Chandler reminded Frierson it had only been a verbal warning.

The balance of the Petitioner's case – essentially, allegations of threats and rewards – is a question of one side's word against another's, which would put it in the very ordinary range of most cases. As such, the Petitioner does not have to make as strong a showing of no adequate remedy at law/irreparable harm as it does with its claim for reinstatement of Frierson. The Petitioner asks for an interim order requiring MTIL to bargain in good faith with the union. The remedy stems from the Supreme Court's holding in *N.L.R.B. v. Gissel Packing Co.,* 395 U.S. 575, 614, (1969). There, the Court held that if "at one point the union had a majority" and the employer has engaged in unfair labor practices "to undermine majority strength and impede the election processes," then the N.L.R.B. can consider issuing a "bargaining order." Such an order requires the employer to negotiate with the union, foregoing the normal election procedures in which the union must demonstrate its majority status. *John Cuneo, Inc. v. N.L.R.B.*, 459 U.S. 1178, 1178–80 (1983). *Gissel* cautioned that this remedy was to be used sparingly, in situations where the N.L.R.B. "finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order. *Gissel*, 395 U.S. at 614-615.

First, though, there has to be some evidence that the union has a chance with the employees. The Petitioner submitted 57 authorization cards out of a possible 86 employees to demonstrate majority support. *See Gissel*, 395 U.S. 575, 614 (1969); *N.L.R.B. v. Orland Park Motor Cars*, 309 F.3d 452, 455–56 (7th Cir. 2002). MTIL contends that a number of the cards are invalid for one reason or another, but the ALJ admitted them into the record over MTIL's objections. MTIL points us to no case that suggests a district court in a 10(j) proceeding can overturn evidentiary rulings made by the ALJ. That's not surprising given the limited role the district court has in this proceeding: predicting how the ALJ and then the Board will rule. If the ALJ already admitted the cards into evidence, it seems unlikely indeed that MTIL will persuade her to change her mind.

The question then becomes whether the alleged unfair labor practices in this case are enough to warrant the relief the Petitioner seeks. The types of violations here – threats of relocation or closing, offers of benefits – are of the type that courts consider detrimental enough to the union election processes to warrant relief that brings a return to the *status quo*. But the Petitioner's argument is a bit exaggerated when he says that "[t]he Seventh Circuit has consistently upheld a *Gissel* bargaining order when presented with facts that are present in this case." [Dkt. # 20, at 11]. The evidence here suggests two meetings where plant relocation and drug tests were threatened, and a union-organizer employee was terminated. But, for the most part, the cases the Petitioner likens this case to involved more serious or more pervasive violations and more compelling evidence. *See N.L.R.B. v. Intersweet, Inc.*, 125 F.3d 1064 (7th Cir. 1997)(*en masse* firings)*; Electro-Voice, Inc.*, 83 F.3d 1559 (interrogation of employees about union supporters, firing those supporters under a vague absenteeism policy, soliciting grievances, threatening plant closure, mass firing of one-third of work force); *Am.'s Best Quality Coatings Corp. (ABQC) v. N.L.R.B.*, 44 F.3d 516 (7th Cir.

1995)(threats by supervisors to be carried out in the event that the Union prevailed, i.e., interrogations, layoffs, withholding of benefits and a refusal to bargain); *Q-1 Motor Exp., Inc.*, 25 F.3d at 473(management repeatedly threatened drivers with shutdown and reopening with new employees rather than allow the drivers to unionize, interrogating drivers and one driver's spouse about the union organization efforts and made explicit and implicit threats of retaliation).

Still, at least one case where the Seventh Circuit upheld a *Gissel* order does have a similar fact pattern: *N.L.R.B. v. Gerig's Dump Trucking, Inc.*, 137 F.3d 936, 942 (7th Cir. 1998). There, the president made a threat of selling the company, told a striking employee he could only come back to work if he brought everyone with him, and offered benefits in a letter. As such, Petitioner has shown enough.

**G.**

The interest at stake in a §10(j) proceeding is the public interest in the integrity of the collective bargaining process. *Am. Red Cross*, 714 F.3d at 557; *Francisco Foods*, 276 F.3d at 300. Where we have evidence of anti-union conduct and erosion of support, a more thorough analysis is unnecessary. *Am. Red Cross*, 714 F.3d at 557. The only harm to the public interest that MTIL seems concerned with, however, is the reinstatement of Frierson, and that issue has already been dealt with before.

**CONCLUSION**

The Petition of the Regional Director of Region 13 of the National Labor Relations Board for Preliminary Injunction under Section 10(j) of the National Labor Relations Act is granted in part and denied in part consistent with the holdings above. The parties shall submit to the court a Preliminary Injunction that complies with this Opinion and the requirements of Rule 65(d), Federal

Rules of Civil Procedure, within seven days of this Opinion.

**ENTERED:**__________________________________
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 11/14/17